

COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

| | | |
|---|---|---|
| HILL COUNTRY PRESERVATION, LLC, | § | No. 08-23-00205-CV |
| Appellant, | § | Appeal from |
| v. | § | 38th Judicial District Court |
| PHILIP G. KING and SYNCHROPILE, INC., | § | of Real County, Texas |
| Appellees. | § | (TC# 2023-3796-DC) |

## MEMORANDUM OPINION

In this construction defect case, Appellant Hill Country Preservation, LLC (HCP) appeals the trial court's order granting summary judgment in favor of Appellees, Philip G. King and SynchroPile, Inc. (collectively, King).[1] For the following reasons, we affirm in part and reverse and remand in part.

## BACKGROUND

### A. HCP sues Cedar Beetle and hires King.

In 2014, HCP hired Cedar Beetle to clear cedar and build an approximately five-mile private road from State Highway 337 to the upper part of the Lewis Ranch in Leakey, Texas. Once

---

[1] This case was transferred to this Court from the Fourth Court of Appeals pursuant to the Texas Supreme Court's docket equalization efforts. Tex. Gov't Code Ann. § 73.001. Accordingly, we follow the precedent of the Fourth Court of Appeals to the extent it might conflict with our own. *See* Tex. R. App. P. 41.3.

the road was completed, potholes and other problems began to appear. After attempting to resolve the issues with Cedar Beetle, in January 2017, HCP sued Cedar Beetle and its president, Fred Bader III, for breach of contract and to remove their lien on the property.

In August 2017, HCP retained geotechnical engineer Philip G. King, SynchroPile's President and sole employee, to serve as its expert witness in the suit. King signed a Professional Services Agreement, by which he agreed to perform an "engineering pavement evaluation" of the road. In that agreement, King estimated that "the review of documents, a site visit to observe conditions and development of our report will take about 16 hours[.]" HCP paid a $4,400 retainer and agreed to a $275 hourly rate. After visiting the site multiple times and performing road core testing, King prepared the report, which concluded the road was not constructed in a good and workmanlike manner.

### B.  HCP and Cedar Beetle agree to settle their claims.

As litigation between HCP and Cedar Beetle continued, the parties attended mediation and engaged in settlement discussions. HCP asked King to work with Cedar Beetle's expert, Larry Struthoff, to jointly recommend repairs and construction specifications that the parties could incorporate into a settlement agreement.

HCP and Cedar Beetle ultimately executed an agreement to settle their claims on April 24, 2019 (the Settlement Agreement). The Settlement Agreement set forth construction specifications for the road based on the recommendations from King and Struthoff. The Settlement Agreement states that the parties "agree to resolve their dispute arising from the construction of the 4.7 mile road pursuant to the advice of their appointed experts, Mr. King and Mr. Larry Struthoff," noting that "[t]he experts agreed upon[] the best method for repair of the road[,]" and outlining the

numerous specific standards for the road's correction. As part of that section, paragraph 4.D of the Settlement Agreement reads:

> [T]he repairs shall be inspected by Phil King, first upon completion of [construction specification] item number 10, next upon completion of item number 17 and last, upon completion of number 25. Any defects noted during their inspection shall be corrected and approved prior to proceeding to the next phase of the agreed-upon repair procedures[.]

The Settlement Agreement also specifies that "any conflicts . . . shall be directed to the Project expert Mr. Phil King in writing for resolution."

### C. King reviews the signed Settlement Agreement.

King maintains he did not receive a copy of the final Settlement Agreement until August 6, 2019, or approximately four months after it was executed. He says that this is when he "first noticed that Larry Struthoff had been dropped . . . as a person to conduct inspections of the roadway." He points out that Paragraph 4.D still includes "their inspection," (rather than "his inspection"), which he says reflects Struthoff's previous inclusion as one of the two inspectors. King says removing Struthoff was done without his "knowledge, consent or approval."

Further, King maintains that while the Settlement Agreement "purports to require additional services to be performed by [him]," those terms were "unilaterally set out in that document without [his] knowledge or consent and to which [he] did not agree." King says that he agreed "to take on the finite role of a third-party neutral for the limited purpose of inspecting Cedar Beetle's/Mr. Bader's repairs to the Project's road and noting in written form for the benefit of the parties any construction defects actually observed by SynchroPile during visual inspection of the work following each of the three (3) work phases identified in the Settlement Agreement." King continues that he "offered to perform those discreet [sic] services neutrally to assist the parties in furthering their settlement efforts expressly conditioned upon the stipulation that SynchroPile's

and [his] duties are limited in their entirety to noting defects actually identified by [him] during [his] visual inspections[.]"

After reviewing the Settlement Agreement, King emailed Lonnie Davenport, one of HCP's owners, and Charlie Downing, HCP's attorney, to clarify his role:

> I want to take a moment to clarify my position in this matter to ensure that all parties are on the same page. The terms of my Agreement for Professional Services are set out in my agreement with HPC Real County from August 26, 2017, including the attached General Terms for Technical Services. The scope of services to be provided by me pursuant to those terms was set out in my cover letter and consisted of a review of the underlying documents, a single site visit to observe conditions, and development of our engineering pavement evaluation report on the 5 1/2 mile road at the property. While I have periodically been asked by HPC to perform additional services under the Agreement to assist the parties in helping find a resolution, those agreements were reached after much discussion.
>
> SynchroPile is not a party to the Settlement Agreement between HCP and Cedar Beetle/Fred Bader and was not involved in the negotiation of that document. In fact, that document was not shared with me until after I had already agreed to conduct another visual inspection to help identify any readily observable *"deviations"* in the road work from the plans and specification. My Summary Report was sent to the two of you on August 9[th] . . . . At that time I was not aware of the final language in the Settlement Agreement . . . because my agreement to provide additional services was under the earlier oral agreement we had made. The Settlement Agreement between HCP and Cedar Beetle/Fred Bader seeks to have me perform three visual inspections of the Cedar Beetle repair work - which I am happy to perform - and to identify any observed remaining *"defects"* in construction based on the Braun lntertec field tests. Cedar Beetle is to be given notice of the observed defects so they can correct them prior to proceeding to the next phase of the agreed upon repair procedures. . . .
>
> As you are no doubt aware, *a "defect"* are [sic] not necessarily the same as *a "deviation"*. A *"defect"* is a deficiency in something essential to the performance of the subject matter. For example, a defect would include a less than specified roadway width or base thickness, the lack of cement in the base material, or a failure to attain the 95 percent of maximum dry density. Not all *"deviations"* from a specification are deemed *"defects"* unless the deviations result in a deficiency in something materially essential to the completed roadway. An example of that in the present situation is Cedar Beetle's deviation related to the moisture contents not being within 2.5 of optimum; with that level of moisture content intended to assist in achieving the specified in-place density. Cedar Beetle did not appear to achieve the specified moisture content reading, but did ultimately achieve the required level of 95 percent of maximum dry density to reach the specified level of quality.

4

My Summary Report dated August 9th identified deficiencies in Cedar Beetle's road work. Not all of those deficiencies are to be considered defects, and the authority given to me under the Settlement Agreement is limited to noting observable defects. Cedar Beetle, in turn, is given the right to correct those defects. To the extent that my Summary Report exceeded my authority under the parties' Settlement Agreement, it is withdrawn.

To further clarify the services that SynchroPile will be providing, we will note any *"defects"* observed during our visual inspection of Cedar Beetle's work based on the Braun lntertec field tests and give notice to Cedar Beetle and HCP of the defects to be corrected prior to proceeding to the next phase of the agreed upon repair procedures. Our responsibility does not include identifying all possible defects as it is expressly limited to our good faith effort to identify readily observable defects in the work and not necessarily all defects. SynchroPile will not certify that the completed roadway does not contain defects. Nor will it become the guarantor or warrantor of Cedar Beetle's work, all such implications being hereby rejected; our services in no way relieves any other party from meeting requirements imposed by commonly accepted industry practices. If any party has any expectation of anything other than the foregoing you are asked to let me know immediately in writing as SynchroPile will not be performing services under any other standard.

King's counsel also wrote to HCP and Cedar Beetle's representatives to reiterate King's

position that:

- SynchroPile was not a party to the underlying lawsuit between HCP, Cedar Beetle and Mr. Bader. Nor did it participate in the negotiation or signing of the resulting Settlement Agreement. In fact, a copy of the Settlement Agreement was not provided to SynchroPile until some four (4) months after the agreement had been fully consummated.

- SynchroPile was initially retained by HCP as its expert to evaluate the road as initially constructed by Cedar Beetle and Mr. Bader pursuant to the terms of SynchroPile's Agreement for Professional Services dated August 26, 2017. Those professional services resulted in a number of defective, deficient and/or non-conforming conditions being identified on the Project which ultimately led to the underlying Lawsuit and its resolution through the Settlement Agreement. As part of the parties' settlement efforts, SynchroPile worked with Cedar Beetle's expert, Mr. Larry Struthoff, to develop agreed standards for the correction of the road. Those standard [sic] were agreed to by all parties as the most effective means of resolving the dispute and are memorialized in the Settlement Agreement. SynchroPile was advised several months later that a global settlement had been reached between the parties such that its services were concluded.

- SynchroPile has, however, agreed to take on the exceedingly finite role of a third-party neutral for the limited purpose of inspecting Cedar Beetle's/Mr.

5

Bader's repairs to the Project's road and noting in written form for the benefit of the parties any construction defects actually observed by SynchroPile during visual inspection of the work following each of the three (3) work phases identified in the Settlement Agreement.

- SynchroPile's limited services are in no way intended to identify all actual or potential defects, deficiencies and/or instances of non-conformance in the repair work, to serve as a guaranty or certification of the absence of defects, deficiencies and/or non-conformities or of the road's ultimate performance, to provide guidance or opinions as to the terms and conditions of the parties' Settlement Agreement, to act as a mediator and/or arbitrator of any dispute between the parties, or otherwise.

- SynchroPile has been asked to "accept the road", "certify the road", identify deviations in the road, to render legal opinions as to contract terms in the Settlement Agreement, to review extrinsic evidence as to the inclusion or omission of materials in the road, to give findings as to the contractor's prior experience, to confirm the findings of HCP's own engineers, to resolve inadequacies in the parties' own contract documents and the County's roadway specifications, to opine as to future warranty obligations, and the like. Such requests are decidedly beyond the scope of SynchroPile's agreement and improperly seek to have SynchroPile advocate on behalf of one party against another. For reasons that should be obvious to all parties, SynchroPile is not willing to accept any such change in its defined role or to expose itself to conflicting obligations.

King maintains that HCP did not respond to either his email or his attorney's letter.

**D. Cedar Beetle begins repairs.**

Meanwhile, shortly after the parties executed the Settlement Agreement, Cedar Beetle began working on agreed-upon repairs to the road. HCP hired Braun Intertec to perform various tests on the road base throughout the repair process to ensure Cedar Beetle was executing to project requirements, which Braun Intertec determined based on conversations with King.

Between July and September 2019, King made at least twelve site visits to observe and inspect Cedar Beetle's work. On August 5, King evaluated Cedar Beetle's performance up to that point as part of a progress report email. He stated that the work was "in general conformance" even though "there were some deviations from the specifications," namely regarding moisture contents and the failure to apply a protective prime coat to the cement within 24 hours of its

6

application. King says he "told both Cedar Beetle and [HCP] of deviations that were occurring" and that "in [his] opinion, those deviations were okay." King alleges that he had "multiple conversations" with Davenport and Downing regarding the deviations before he sent the progress report email. But King says that he wrote his progress report email before he reviewed the final language of the Settlement Agreement.

King maintains that he was not on site "to enforce the specifications," and he testified that he did not believe he had the authority to approve or disapprove any of the deviations from the specifications in the Settlement Agreement. Instead, he states that he was on site "to perform site specific inspections" related to the three separate inspections noted in the Settlement Agreement that he agreed to perform. Bader affirmed that King was on site to "observe[] Cedar Beetle's work and provide[] direction when requested" as to "observed deficiencies in reconstructing the road base," noting that "Cedar Beetle consulted with Mr. King to determine exactly how the deficiency was to be addresse[d], and followed his directions in all respects."

On September 24, 2019, King submitted his report titled "Observed Defects Report of Third-Party Neutral As outlined in the Settlement Agreement"—i.e., the contemplated inspection following Cedar Beetle's completion of work item numbers 10 and 17 in the Settlement Agreement. The report stated that King "periodically visited the site during Cedar Beetle's work, and on several occasions brought to Cedar Beetle's attention defects he observed at the time of those site visits," which "Cedar Beetle corrected." The report described several "defects" that King observed, as well as "substantial deterioration" of the prime coat, but noted the "roadway is ready to accept the chip seal application immediately following blading of the roadway surface" "[s]ubject to the resolution of observed defects." The report also included a "Limitations and Conditions" section, which reaffirmed King's position that he did not "participate in the

7

negotiation or signing of the resulting Settlement Agreement beyond working with Cedar Beetle's expert to prepare an agreed set of specifications for the repair of the existing roadway" and his "services are expressly limited to noting any 'defects' actually observed . . . during his visual inspections of Cedar Beetle's work, and to provide the parties with this written notice of those observed defects for purposes of correcting them prior to proceeding to the next phase of the agreed upon repair procedures." This section also states King "expressly rejects any attempt to make SynchroPile and/or Mr. King the guarantor or warrantor of Cedar Beetle's and/or Mr. Bader's work, all such implications being hereby rejected; our services in no way relieve any other party from meeting requirements imposed by commonly accepted industry practices."

King conducted a final inspection of the road and issued a "Supplemental Letter Related to Observed Defects Report of Third-Party Neutral" on June 26, 2020—i.e., the final report contemplated by the Settlement Agreement—in which he concluded that two of the defects identified in his previous report had been addressed, and the roadway was ready for sealing. He later confirmed that by this point, Cedar Beetle's work "was in conformance to what [he] was very comfortable with," and "Cedar Beetle built the Road in a good and workmanlike manner and in accordance with the specifications in the parties' settlement agreement."

But HCP maintained that Cedar Beetle "failed to remedy the problems with the road as promised" and amended its petition in the pending litigation.

### E. HCP sues King and SynchroPile.

In March 2021, HCP added King and SynchroPile as defendants in their existing lawsuit against Cedar Beetle and Bader. HCP asserted negligence and breach of contract claims for failure to adequately inspect Cedar Beetle's road repairs and ensure they met the Settlement Agreement's specifications. In particular, HCP alleged that King owed HCP—and breached—the duty to

8

"supervise the Project" and "approve construction of the road base," and to ensure both were completed "in a good and workmanlike manner and according to the specifications." HCP added an alternative claim for tortious interference with contract against King for "unilaterally changing the specifications and opining that Cedar Beetle had satisfactorily constructed the new road." HCP also added a novation claim, stating that the limitation-of-liability clause in the Professional Services Agreement did not extend to King individually, but even if it did, "a novation occurred when the parties into the Settlement Agreement because they intended that its terms would be substituted for those in the Professional Services Agreement."

Cedar Beetle filed two motions for summary judgment: the first motion for partial summary judgment asserted that HCP breached the Settlement Agreement by refusing to pave the road base after King reported that it was ready; and the second traditional and no-evidence motion (which Bader joined) sought judgment on the remaining claims asserted against it. The trial court granted both and dismissed all claims against Cedar Beetle and Bader with prejudice.

King also moved for summary judgment, arguing that (1) HCP cannot recover more than $50,000 from King because the limitation-of-liability clause in the Professional Services Agreement caps recovery at that amount; (2) neither King nor SynchroPile are bound by the Settlement Agreement because they were not parties to it; (3) neither novation nor merger exist due to a mutual mistake regarding HCP and King's misunderstanding regarding his role in the Settlement Agreement; (4) King is entitled to arbitral immunity; and (5) HCP's claims are barred by res judicata.

HCP responded to King's motion, attaching, among other things, a declaration and accompanying report prepared by Dr. David Sykora regarding the design, construction, and

9

performance of the road. One day after the trial court held a hearing on King's motion for summary judgment, King moved to strike Dr. Sykora's declaration and report.

The trial court granted both King's motion to strike and motion for summary judgment. Its order granting King's motion for summary judgment noted that the motion was "[g]ranted except for the Limitation of Liability Issue which is made moot by the ruling denying Plaintiff's relief on the merits." The trial court then dismissed all of HCP's claims against King and SynchroPile with prejudice and severed those claims into a new cause, constituting a final judgment as to King and SynchroPile. HCP appealed.[2]

## DISCUSSION

HCP raises two issues in this appeal: (1) whether the trial court erred by granting King's motion for summary judgment; and (2) whether the trial court abused its discretion by striking Dr. Sykora's declaration and expert report. Because the latter implicates which evidence we may consider in this appeal, we address it first.

### A. Motion to strike Dr. Sykora's report

King moved to strike Dr. Sykora's declaration and accompanying report because he argued the declaration does not meet the formal requirements of Texas Rule of Civil Procedure "166a(e)"[3] and "contain[s] only conclusionary statements, immaterial statements, and irrelevant conclusions." King also complained that the declaration "contains unsubstantial opinions," "is based on hearsay," "is that of an interested party and it is not clear, positive, direct, credible, or free from contradictions," "contains statements that are in conflict with another," "violates the parole

---

[2] In its appeal, HCP addresses only its breach-of-contract and negligence claims, not its alternative claims regarding tortious interference with contract and novation.

[3] King appears to refer to an earlier version of Rule 166a(e), which provided rules for affidavits in support of motions for summary judgment. *See Cook v. Frazier*, 765 S.W.2d 546, 551 (Tex. App.—Fort Worth 1989, no writ) (discussing then-effective Rule 166a(e) in context of purportedly defective affidavits).

evidence rule," "does not include the affiant's qualifications to state his opinions regarding this case," and "states mere legal conclusions." HCP argues the trial court abused its discretion by striking Dr. Sykora's declaration and report because (1) the declaration was presented in the proper form, and King's objections to its substance were conclusory; and (2) King did not object to the report, so it should have been admitted. We agree.

Except in circumstances not relevant here, an unsworn declaration that meets certain criteria may be used in lieu of an affidavit. Tex. Civ. Prac. & Rem. Code Ann. § 132.001(a). The declaration must be in writing, subscribed to as true under penalty of perjury by the person making the declaration, and accompanied by a jurat in substantially the same form as statutorily authorized by § 132.001(d). *Id.* § 132.001(c). Rule 166a(f) provides that "[d]efects in the form of affidavits or attachments will not be grounds for reversal unless specifically pointed out by objection by an opposing party with opportunity, but refusal, to amend." Tex. R. Civ. P. 166a(f).

We review a trial court's evidentiary rulings for abuse of discretion. *Sw. Energy Prod. Co. v. Berry-Helfand*, 491 S.W.3d 699, 727 (Tex. 2016). However, "[e]rroneous rulings require reversal only if a review of the record reveals the error was harmful." *Id.* at 728 (citing Tex. R. App. P. 44.1). "Errors in admission or exclusion of evidence are generally not reversible unless the appellant can show the whole case turns on the complained of evidence." *PNP Petroleum I, LP v. Taylor*, 438 S.W.3d 723, 732 (Tex. App.—San Antonio 2014, pet. denied) (quoting *In re Estate of Denman*, 362 S.W.3d 134, 140 (Tex. App.—San Antonio 2011, no pet.)).

Dr. Sykora's declaration indicates that he was hired by Branscomb Law to investigate the design, construction, and performance of the Lewis Ranch Road and attests to the report he generated. He recites his full name, birthdate, and address, and "declare[s] under penalty of perjury that the forgoing is true and correct."

11

This meets the requirements of an unsworn declaration under § 132.001. King's complaint that the declaration fails to meet Rule 166a's requirements thus fails. And even assuming King's other numerous objections were directed at Dr. Sykora's report—and not his declaration— the objections are do not identify any specific language in the report as objectionable. *Brown v. Arenson*, 571 S.W.3d 324, 332 (Tex. App.—Houston [1st Dist.] 2018, no pet.); *Stewart v. Sanmina Texas L.P.*, 156 S.W.3d 198, 207 (Tex. App.—Dallas 2005, no pet.); *Womco, Inc. v. Navistar Int'l. Corp.*, 84 S.W.3d 272, 281 n.6 (Tex. App—Tyler 2002 no pet.).

Finally, King argues that even if the trial court erred by striking Dr. Sykora's report, it was harmless error. But as HCP points out, it submitted Dr. Sykora's report in an attempt to raise a fact issue regarding whether King breached his duty of care. In other words, in opposing King's motion for summary judgment, HCP attempted to raise a fact issue on breach to support its negligence claim. Because the standard of care in a professional negligence claim for engineering services must be established by qualified expert testimony, Dr. Sykora's report was an essential component to HCP's opposition to King's motion for summary judgment. *See Parkway Co. v. Woodruff*, 857 S.W.2d 903, 919 (Tex. App.—Houston [1st Dist.] 1993), *aff'd as modified on other grounds*, 901 S.W.2d 434 (Tex. 1995).

Thus, the trial court erred by striking Dr. Sykora's declaration and report, and we may consider this evidence in our review of the summary judgment.

HCP's issue on this point is sustained.

## B.   Motion for summary judgment

HCP contends the trial court erred by granting King's motion for summary judgment for several reasons. First, HCP maintains there are fact issues as to whether King's conduct constituted acceptance of its offer to perform the inspection work described in the Settlement Agreement, such

that King has not conclusively proven that he did not agree to inspect the repairs described in the Settlement Agreement. Second, HCP challenges King's mutual mistake argument in light of the Settlement Agreement's language and the evidence that King actually undertook to perform those duties. Third, HCP argues arbitral immunity does not extend to professional engineers rendering engineering services in Texas, but that even if it did, King failed to conclusively prove his entitlement to it. Finally, HCP urges that res judicata is inapplicable.

### (1) Standard of review

We review a trial court's ruling on summary judgment de novo. *Lightning Oil Co. v. Anadarko E&P Onshore, LLC*, 520 S.W.3d 39, 45 (Tex. 2017). In a traditional summary-judgment motion, the moving party must show there is no genuine issue of material fact as to one or more essential elements of the plaintiff's cause of action. Tex. R. Civ. P. 166a(c). Once a defendant disproves at least one essential element of the plaintiff's claims, the burden shifts to the plaintiff to present evidence raising a fact issue to defeat the motion for summary judgment. *Briggs v. Toyota Mfg. of Texas*, 337 S.W.3d 275, 281–82 (Tex. App.—San Antonio 2010, no pet.).

### (2) Analysis

#### (a) Whether HCP raised a genuine issue of material fact in opposing King's motion for summary judgment

First, HCP argues King failed to conclusively disprove a valid agreement to inspect Cedar Beetle's repair work for compliance with the Settlement Agreement's specifications. HCP notes that King's summary-judgment motion does not expressly address any specific element of an enforceable contract but instead focuses on the fact that he did not negotiate or sign the Settlement Agreement such that he cannot be bound by its terms. But HCP contends that King's conduct contradicts his assertion that he did not assent to perform the services described by the Settlement Agreement. Specifically, HCP argues that once King received a copy of the Settlement Agreement

13

and discovered its proposal for him, he could either decline to do the work or accept the proposal to render services. HCP maintains that by doing the repair inspections and accepting payment for those services, King agreed to be bound by the terms of the Settlement Agreement, including ensuring Cedar Beetle's repairs met its specifications.

King maintains that his only involvement with the Settlement Agreement was developing a proposed set of specifications with Struthoff based on the HCP and Cedar Beetle's request, and he was unaware of the final terms of the Settlement Agreement, including which specifications were incorporated and his role as the sole inspector and "project expert," until several months after it was finalized. As to HCP's argument regarding King's conduct constituting his acceptance to the Settlement Agreement's terms,[4] King argues that as soon as he received a copy of the Settlement Agreement, he notified the parties of his position that "it did not apply" to him, and his attorney did the same.

"It goes without saying that a contract cannot bind a nonparty." *EEOC v. Waffle House, Inc.*, 534 U.S. 279, 294 (2002); *see also FFGGP, Inc. as trustee of Windward Trace 9131 Land Tr. v. MTGLQ Invs. LP*, 646 S.W.3d 30, 38 (Tex. App.—San Antonio 2022, no pet.) ("Although parties are generally free to contract as they wish, their agreement does not bind the entire world."). In some circumstances, principles of contract and agency law may bind a nonsignatory to an agreement. *See, e.g.*, *In re Kellogg Brown & Root, Inc.*, 166 S.W.3d 732, 739 (Tex. 2005) (recognizing six theories that may bind nonsignatories to arbitration agreements); *BML Stage Lighting, Inc. v. Mayflower Transit, Inc.*, 14 S.W.3d 395, 400–02 (Tex. App.—Houston [14th Dist.] 2000, pet. denied) (considering whether various contract or agency principles

---

[4] Although King asserts that HCP waived this acceptance-by-performance argument, a review of the record confirms that HCP's pleadings and response to King's motion for summary judgment were sufficient to fairly apprise King of this argument. *See McConnell v. Southside Indep. Sch. Dist.*, 858 S.W.2d 337, 343 (Tex. 1993).

permitted nonsignatory to assert contractual lien on goods). But the plaintiff bears the burden of pleading a basis for liability against each defendant. *See* Tex. R. Civ. P. 47.

It is undisputed that King did not sign the Settlement Agreement. He is also not a party under its terms.[5] Yet HCP's claims against King primarily arise from his purported duties and powers under the Settlement Agreement. For example, HCP's breach of contract claim alleges that King "agreed to serve as Project Expert for the reconstruction of the road base," but "allow[ed] the road to be constructed in a manner inconsistent with the specifications in the Settlement Agreement." And in support of its negligence and negligent-undertaking claims, HCP asserts that "Synchropile and/or King failed to fulfill the terms of their contract or agreement with HCP to provide adequate specifications and to properly oversee the construction of the road"; "King owed [HCP] a duty to create specifications sufficient to ensure that the road was completed in a good and workmanlike manner"[6]; and "Synchropile and/or King undertook a duty to act as the project expert for the construction of the roadway under the Settlement Agreement[.]" That is, these claims hinge on King's purported duty to perform under the Settlement Agreement or his allegedly negligent or improper execution of his powers granted by the Settlement Agreement.

Once King moved for summary judgment and established that he was not a party to the Settlement Agreement, the burden shifted to HCP to raise a genuine issue of material fact as to whether King was bound by its terms. *See Briggs*, 337 S.W.3d at 281–82. Though HCP argues that King's "conduct accepted a proposal to perform the described inspection work," it fails to

---

[5] The Settlement Agreement states that "The parties to this agreement are HILL COUNTRY PRESERVATION, LLC (HCP), the property owner, represented by Lonnie Davenport; CEDAR BEETLE, INC., represented by Trey Bader, MGMC, represented by Chester Maples, and Hardy C. Lewis, Individually."

[6] To the extent that HCP claims King had a duty to create "specifications" for the Settlement Agreement, HCP has not identified any such agreement by King to do so beyond HCP's request that King work with Struthoff, to jointly recommend repairs and construction specifications that the parties could incorporate into a settlement agreement— which King did not draft, approve, or even review until well after its execution.

15

point to any evidence in the record that raises a genuine issue of material fact on that point. Specifically, HCP points to the fact that King made site visits, assisted Braun Intertec in developing its scope of services, and billed for his services.[7] Indeed, these actions are consistent with the responsibilities King did agree to assume. Through King's direct communications with HCP, his attorney's letter to HCP and Cedar Beetle, and his incorporation of language into his report describing his role, King made clear that he did not accept all of the duties that the Settlement Agreement purported to bestow upon him and clarified what he was willing to do: take on the "role of a third-party neutral for the limited purpose of inspecting Cedar Beetle's/Mr. Bader's repairs to the Project's road and noting in written form for the benefit of the parties any construction defects actually observed by SynchroPile during visual inspection of the work following each of the three (3) work phases identified in the Settlement Agreement." King's conduct, including his subsequent site visits and reports, reflect his agreement to do just that.

However, HCP also generally alleged that King's purported negligence extends to his professional "workmanship." Viewing the evidence in the light most favorable to HCP, as we must on this procedural posture, we conclude that Dr. Sykora's report raises a genuine issue of material fact regarding whether King breached his duty of care as to the professional engineering services he *did* agree to provide—that is, performing site inspections during construction repairs and noting any defects observed during each of the three work phases.[8] Specifically, Dr. Sykora opined that King's professional engineering services fell below the standard of care because, among other things, "King did not appear to apply any criteria to moisture content" in his assessment of repairs

---

[7] HCP also points to King's deposition testimony in which he describes his August 5, 2019 progress report email and the accompanying site visit. However, HCP does not explain how testimony regarding this progress report could support King's purported intent to be bound by the Settlement Agreement when King did not even receive a copy of the Settlement Agreement until August 6, 2019.

[8] Dr. Sykora's report contains other conclusions based on responsibilities King did not agree to assume. Dr. Sykora's conclusions on those points are immaterial for purposes of this appeal.

during construction. This assessment conflicts with King's statements to HCP that in his view, the moisture content deviations from specifications "were okay" and "the project should be accepted" (in light of the final densities) based on his report and professional engineering opinion.

By agreeing to perform certain professional engineering services for HCP, King took on the duty to exercise the degree of care, skill, and competence that reasonably competent engineers would exercise under similar circumstances. *See Romero v. Parkhill, Smith & Cooper, Inc.*, 881 S.W.2d 522, 525 (Tex. App.—El Paso 1994, writ denied). While King limited his role in the project, a breach of the professional duties he did assume would support a negligence claim. *See id.*; *see also Dukes v. Philip Johnson/Alan Ritchie Architects, P.C.*, 252 S.W.3d 586, 594 (Tex. App.—Fort Worth 2008, pet. denied) ("An engineer . . . must use the skill and care in the performance of his duties commensurate with the requirements of his profession and is only liable for a failure to exercise reasonable care and skill commensurate with those requirements.").

In sum, because HCP did not point to any evidence that raises a genuine issue of material fact regarding whether King is bound by the Settlement Agreement, the trial court properly granted King's motion for summary judgment on that basis—that is, by dismissing HCP's breach of contract claim and negligence claim as it relates to duties stemming from the Settlement Agreement. However, HCP has raised a genuine issue of material fact as to whether King breached his duty of care in carrying out the professional engineering services that he did agree to provide.[9]

We sustain HCP's issue only as it relates to its negligence claim pertaining to the duties King agreed to provide and overrule HCP's issue on its remaining claims.

---

[9] The trial court's order from which HCP appeals grants King's motion for summary judgment "except for the Limitation of Liability Issue which is made moot by the ruling . . . on the merits." Thus, the limitation of liability issue—involving the reach of the limitation-of-liabilities clause in King's Professional Services Agreement, which the parties appear to have extensively briefed at the trial court level—is not before us on appeal. We express no opinion on that matter.

**(b)** **King is not entitled to summary judgment based on the affirmative defense of mutual mistake.**

HCP argues that King's mutual mistake defense does not support summary judgment. King maintains it applies because "there was clearly a misunderstanding of material fact about the delegation of duties" in the Settlement Agreement.

Mutual mistake is an affirmative defense that "requires evidence showing both parties were acting under the *same* misunderstanding regarding the same material fact." *Samson Expl., LLC v. T.S. Reed Props., Inc.*, 521 S.W.3d 766, 779 (Tex. 2017) (emphasis added); *see Garza v. Villarreal*, 345 S.W.3d 473, 483 (Tex. App.—San Antonio 2011, pet. denied). Here, the record shows King presented no evidence to establish the defense of mutual mistake. Indeed, King's motion and appellate brief outlines an alleged different misunderstanding regarding the same material fact concerning the Settlement Agreement (King's role in the construction repair process). Because that does not fit within the scope of mutual mistake, the Settlement Agreement was not unenforceable based on mutual mistake grounds.

To the extent the trial court granted summary judgment on the affirmative defense of mutual mistake, that was error. We sustain HCP's issue on this point.

**(c)** **King is not entitled to summary judgment based on arbitral immunity.**

HCP argues that King did not prove his entitlement to arbitral immunity, noting that no Texas court has ever extended that defense to an engineer. While King acknowledges that Texas has not extended arbitral immunity to engineers, he maintains that the trial court did not err by granting summary judgment on this ground because "engineers acting to resolve conflicts should be immune from suit."

Though the Texas Supreme Court has not opined on the doctrine of arbitral immunity, it has been "recognized by virtually all of the various states, as well as by the federal courts," and

some of our sister courts. *Pullara v. Am. Arbitration Ass'n, Inc.*, 191 S.W.3d 903, 907 (Tex. App.—Texarkana 2006, pet. denied) (collecting cases); *see Butz v. Economou*, 438 U.S. 478, 510–13 (1978); *Rao v. Am. Arbitration Ass'n*, No. 05-13-00462-CV, 2014 WL 3513258, at *2–3 (Tex. App.—Dallas July 15, 2014, pet. denied) (mem. op.); *Blue Cross Blue Shield of Texas v. Juneau*, 114 S.W.3d 126, 130–33 (Tex. App.—Austin 2003, no pet.).

"Arbitral immunity is derived from judicial immunity, which establishes that judges are absolutely immune from personal liability for judicial acts that are not performed in clear absence of all jurisdiction, regardless of how erroneous the act, or how evil the motive." *Juneau*, 114 S.W.3d at 131 (citing *Stump v. Sparkman*, 435 U.S. 349, 355–56 (1978)). Arbitral immunity extends to individuals "whose responsibilities are 'functionally comparable' to those of a judge[.]" *Id.* (citing *Butz*, 438 U.S. at 510–13).

The factors courts consider in determining whether an agency or its members perform quasi-judicial functions entitling them to arbitral immunity include:

1. the need to assure that the individual can perform his functions without harassment or intimidation;

2. the presence of safeguards that reduce the need for private damages actions as a means of controlling unconstitutional conduct;

3. insulation from political influence;

4. the importance of precedence;

5. the adversary nature of the process; and

6. the correctability of error on appeal.

*Id.* (citing *Butz*, 438 U.S. at 512). In concluding immunity extends to arbitrators for acts within the scope of their duties, the Austin Court of Appeals focused on Texas public policy, which "encourages arbitration," noting that extending immunity to arbitrations "is especially compelling because arbitration is the means the parties selected for disposing of controversies between them."

*Id.* at 133. That is, "arbitral immunity is essential to the maintenance of arbitration by contractual agreement as a viable alternative to the judicial process for the settlement of controversies[.]" *Id.*

While there exists a dearth of Texas cases involving arbitral immunity, both parties here agree that no Texas court has extended its reach to engineers. Still, King maintains arbitral immunity does apply to professional engineers acting "as a third-party neutral" or "as a mediator and/or arbitrator," and that this extension of immunity is necessary so that engineers "will not be governed by fear of lawsuits, and can freely engage their own professional judgment as to the merits of the matters they must decide." He urges us to follow a North Carolina case that concluded supervising engineers could not be held liable for damages to either party in the absence of bad faith because under the terms of the contract, the engineers "would be acting in the capacity of arbitrators[.]" *See City of Durham v. Reidsville Eng'g Co.*, 120 S.E.2d 564, 567 (N.C. 1961). King thus asks us to extend *Reidsville Engineering*'s logic to this case and conclude he is immune from suit.

We decline to extend arbitral immunity beyond its current place in Texas jurisprudence. The language of the Settlement Agreement that King contends triggers his entitlement to arbitral immunity states: "Any conflicts contained herein shall be directed to the Project expert Mr. Phil King in writing for resolution." We cannot conclude that this language, without more, meant King had responsibilities that are "functionally comparable" to those of a judge under the *Butz* factors. *Cf. Sledd v. Garrett*, 123 S.W.3d 592, 594–96 (Tex. App.—Houston [14th Dist.] 2003, no pet.) (determining appraisal review board panel members are entitled to judicial immunity because panel members "have duties similar to judges," including "the power to subpoena witnesses and documents" and hear "sworn testimony, evidence, or argument"). Plus, there is nothing in the record that suggests King actually did resolve any disputes submitted under this provision or the

manner by which he was to do so, distinguishing this case from *Reidsville Engineering*.[10] And given the project-specific nature of this role, many of the *Butz* factors—e.g., controlling unconstitutional conduct, insulation from political influence, the importance of precedence— simply are not implicated.

Given the lack of precedential authority that would extend arbitral immunity to an engineer charged with resolving project-specific construction-related disputes, King is not entitled to summary judgment on that basis. We sustain HCP's issue on this point.

### (d) King is not entitled to summary judgment based on res judicata.

Finally, HCP argues that res judicata cannot support the trial court's judgment because it does not apply to this case. Specifically, HCP contends: (1) when King filed his motion for summary judgment, the Cedar Beetle summary judgment was still interlocutory such that it cannot be a prior final judgment for res judicata purposes; (2) neither King nor SynchroPile are in privity with Cedar Beetle because Cedar Beetle's summary judgment did not resolve any of their claims or defenses, and HCP's claims against Cedar Beetle asserted breach arising from different conduct than its claims against King; and (3) there is no "second action."

"The doctrine of res judicata, or claim preclusion, bars causes of action that have already been fully adjudicated or that, with the use of diligence, could have been brought in the prior suit." *Rosetta Res. Operating, LP v. Martin*, 645 S.W.3d 212, 225 (Tex. 2022). "Res judicata requires proof of three elements: '(1) a prior final judgment on the merits by a court of competent jurisdiction; (2) identity of parties or those in privity with them; and (3) a second action based on the same claims as were raised or could have been raised in the first action.'" *Id.* (quoting *Amstadt*

---

[10] Even the seminal treatise on construction law characterizes the reach of arbitral immunity determined by *Reidsville Engineering* as "somewhat of an extreme position." 5 BRUNER & O'CONNOR, CONSTRUCTION LAW § 17:84 (2023).

*v. U.S. Brass Corp.*, 919 S.W.2d 644, 652 (Tex. 1996)). "Parties may be in privity if (1) they 'control an action,' (2) 'their interests can be represented by a party to the action,' or (3) they are 'successors in interest.'" *Id.* (quoting *Amstadt*, 919 S.W.2d at 653). "Privity exists if the parties share an identity of interests in the basic legal right that is the subject of litigation." *Amstadt*, 919 S.W.2d at 653. "To determine whether a prior and later lawsuit involve the same basic subject matter, we focus on the factual basis of the complaint." *Id.* "The party asserting the defense of res judicata has the burden of proving each element of the defense." *Eagle Oil & Gas Co. v. TRO-X, L.P.*, 619 S.W.3d 699, 706 (Tex. 2021) (citing Tex. R. Civ. P. 94). Res judicata serves to "ensure that a defendant is not twice vexed for the same acts, and to achieve judicial economy by precluding those who have had a fair trial from relitigating claims." *Amstadt*, 919 S.W.2d at 653.

King's motion for summary judgment asserts that the trial court granted summary judgment for Cedar Beetle on the grounds that HCP breached the Settlement Agreement. And King contends this ruling and its order dismissing all claims against Cedar Beetle were "prior final judgments" that have a preclusive effect on this suit because if the trial court found that Cedar Beetle "fully performed all of the requirements of the Settlement Agreement," "King and SynchroPile cannot have been negligent" or been engaged in "negligent undertaking [or] tortiously interfered with Cedar Beetle or breached any alleged contract[.]" King then states that he and SynchroPile "are in privity with Cedar Beetle," and "HCP's claims against Cedar Beetle are the same claims against King and SynchroPile." In support of this argument, King refers to the trial court's order granting Cedar Beetle's motion for partial summary judgment and its order granting Cedar Beetle's traditional and no-evidence motions for partial summary judgment.

King has not conclusively shown that res judicata bars HCP's claims because at minimum, King has not attempted to demonstrate how he or SynchoPile are in privity with Cedar Beetle.

22

King has not argued, and the record does not suggest, that one of the parties controlled the other, succeeded in interest from the other, or held the same interests with respect to the Settlement Agreement or any other agreement with HCP regarding the road. *See Rosetta Res. Operating*, 645 S.W.3d at 226.

Further, "res judicata does not apply between separate actions created by a trial-court severance," as happened here. *Id.* at 225–26. While the severance of the Cedar Beetle summary judgment created a separate action, this case began as a single action against several defendants, including Cedar Beetle, King, and SynchroPile. The Texas Supreme Court has "recognized—as a 'logical corollary' to the general rule—that 'the res judicata effects of an action cannot preclude litigation of claims that a trial court explicitly separates or severs from that action.'" *Id.* (quoting *Van Dyke v. Boswell, O'Toole, Davis & Pickering*, 697 S.W.2d 381, 384 (Tex. 1985)). On appeal, King points to the fact that HCP's claims against Cedar Beetle are "even more similar than having the same 'basic nature.'" But that ignores the fact that HCP's claims involved different alleged duties held by separate parties and different breaches of those alleged duties. Indeed, this is exactly why a severance was possible here: Cedar Beetle is not in privity with King or SynchroPile, and HCP's claims against each party were different. *See id.* at 226.

Because King has not conclusively established the three res judicata elements, he is not entitled to summary judgment on those grounds. To the extent the trial court's ruling turned on the determination that res judicata applies, that was error. We sustain HCP's issue on this point.

## CONCLUSION

We affirm the trial court's order granting summary judgment and dismissing HCP's claims against King and SynchroPile, except we reverse as to HCP's negligence claim arising from the

23

specific professional engineering services King agreed to perform. We remand for further proceedings consistent with this opinion.

LISA J. SOTO, Justice

April 30, 2024

Before Alley, C.J., Palafox and Soto, JJ.
Alley, C.J., concurring without opinion.